OPINION OF THE COURT
Phyllis Gangel-Jacob, J.
By this CPLR article 78 proceeding petitioners seek to validate for placement on the November 3, 1998 general election ballot a referendum to amend section 1051 of chapter 46 of the New York City Charter (Charter) by requiring the establishment of a voluntary system of campaign finance reform defined as a system which will provide to qualified candidates for the offices of Mayor, Comptroller, Public Advocate, Borough President and City Council Member who “raise no more than 20% of the applicable voluntary spending limits from private contributions” the balance of such voluntary spending limit from public funds. The initiative contemplates an increase in the moneys to be set aside for a voluntary system of campaign finance reform under the Charter, and specifies that to the extent necessary, such additional funds shall be raised by reducing the amount of funds on a proportionate basis that would otherwise be available in the general fund *13 for each of the offices of the Mayor, Comptroller, Public Advocate, Borough Presidents and City Council.[1]
“The Constitution vests the power to legislate in a representative Legislature not the people (NY Const, art III, § 1). The legislative authority of the City of New York has been placed in the City Council (Charter, ch 2, § 21). To the extent that there may be direct legislative action by the people, that authority must rest upon a specific constitutional or statutory grant (Matter of McCabe v Voorhis, 243 NY 401, 413 * * *). The authority for the initiative and referendum procedure is found in Municipal Home Rule Law § 37” (Matter of Adams v *14 Cuevas, 133 Misc 2d 63, 65 [Sup Ct, NY County], affd 123 AD2d 526, affd 68 NY2d 188 [1986]).
Municipal Home Rule Law § 37 (1) provides that “[a] local law amending a city charter (however extensively) or providing a new city charter” may be adopted by popular referendum. A petition to amend the City Charter by voter initiative under Municipal Home Rule Law § 37 must set forth in full the proposed local law, requires the signatures of at least 30,000 qualified electors and must be filed with the City Clerk (Municipal Home Rule Law § 37 [2]). The City Clerk is required to examine the proposed amendment and certify to the City Council that the petition complies or does not comply with all the requirements of law (Municipal Home Rule Law § 37 [5]; see, Municipal Home Rule Law § 24 [1]). “The City Council is not bound by the certification of the Clerk that the proposed local law is not valid. (Matter of Adams v Cuevas, 133 Misc 2d 63, 64 [Sup Ct, NY County], affd 123 AD2d 526 [1st Dept], affd on other grounds 68 NY2d 188 [1986].) However, such certification affects the rights of the initiative’s sponsor and may be challenged in a proceeding in this court. (Supra, at 64-65; see, Municipal Home Rule Law § 37 [5].)” (Matter of Roth v Cuevas, 158 Misc 2d 238, 241 [Sup Ct, NY County], affd 197 AD2d 369 [1st Dept], affd 82 NY2d 791 [1993].) If the petition meets all the requirements of law the City Council has a period of two months to adopt the initiative without change or, if it requires a referendum, to submit it without change to the voters (Municipal Home Rule Law § 37 [7]). If the City Council fails to so act, the initiative may be placed on the ballot by filing with the City Clerk an additional petition signed by at least 15,000 qualified electors who did not sign the original petition (Municipal Home Rule Law § 37 [7]). If the additional petition complies with all the requirements of law the City Clerk must transmit it “in the form in which it is to be submitted to the election officers charged with the duty of publishing the notice of such election, and the legislative body shall provide for suitable publication thereof and publicity thereon for the information of interested voters” (Municipal Home Rule Law § 37 [9]). The proposed amendment must “set forth the new matter to be added to the charter either in italics or underlined and the matter to be deleted therefrom either in brackets or with lines drawn through it, and after adoption the matter so set forth in italics or underlined may be set forth in the charter in ordinary type, and the matter in brackets or with lines through it may be omitted; but failure so to set forth any provision of the *15 charter which is in fact superseded shall not invalidate the amendment or new charter or any portion thereof’ (Municipal Home Rule Law § 37 [3]). The Clerk is prohibited from certifying as legally valid any petition for a proposed local law which requires the expenditure of money unless there is submitted, as a part of such proposed local law, a plan to provide moneys and revenues sufficient to meet such proposed expenditures (Municipal Home Rule Law § 37 [11]).
On July 1, 1998 the sponsor of the initiative petition at issue filed it with the City Clerk. On July 17, 1998 the Board of Elections advised that the petition contained a total of 59,767 signatures of which 30,275 were valid. There is no dispute that the petition contains the requisite number of valid signatures. On July 30, 1998 the City Clerk’s office certified the initiative petition to the City Council as invalid on the grounds (1) it proposes the addition of new material unrelated to the City’s short form Charter; (2) it fails to give voters adequate notice of the effect that the adoption of the proposed local law would have on the City’s existing campaign finance program which is codified in the Administrative Code of the City of New York (see, Administrative Code, tit 3, ch 7, § 3-701 et seq., entitled “Campaign Financing”); and (3) the proposed local law fails to include an appropriate plan to provide moneys and revenues as required by Municipal Home Rule Law § 37 (11).
Petitioners now move by order to show cause for a declaration validating the initiative and a direction to the City Clerk to certify the initiative to the City Council as in compliance with all requirements of law.
It has been held that to determine whether a public initiative is a proper subject for Charter amendment the court must find either (1) that it relates directly to an existing Charter provision, or (2) if it is unrelated, that an amendment unrelated to an existing Charter provision may be adopted by the initiative and referendum procedure (Matter of Adams v Cuevas, supra, 133 Misc 2d, at 67; Matter of Juntikka v Cuevas, Sup Ct, NY County, Oct. 22, 1996, Shainswit, J., index No. 116778/96, affd 232 AD2d 301 [1st Dept], Iv denied 88 NY2d 817 [1996]; see also, Matter of Roth v Cuevas, 158 Misc 2d 238, 249 [Sup Ct, NY County], affd 197 AD2d 369 [1st Dept], affd 82 NY2d 791, supra [“A charter amendment has been held to include a proposed law that ‘has a direct relation to’ * * * or ‘affects’ * * * existing provisions in a charter” (citations omitted)]). “The facts which control will be found in the nature of the proposed local law and its relation to the provisions of *16 [the] particular city charter. The most that can be said is that in the consideration of these controlling facts will be found the basis for determination as to whether in the particular case the proposed law is in truth an amendment of the Charter or is so far unrelated to the Charter as to be an amendment only in name” (Matter of Astwood v Cohen, 291 NY 484, 488 [1943]).
Petitioners urge that their proposed local law which addresses chapter 46 of the Charter clearly changes, affects and has a direct relation to existing Charter provisions and is a bona fide Charter amendment proposal, and that the clear implication from the face of the initiative itself is that further implementing legislation will be required.
Chapter 46 of the Charter, which encompasses section 1051 sought here to be amended, was added to the Charter at the general election of November 8, 1988 as proposed by the then Charter Revision Commission in response to public and official desire for campaign finance reform. Concern about the over-escalating cost of running for office in New York City which inhibited healthy competition and the perceived influence of large scale contributors on government decision making led to measures adopted both legislatively for incorporation into the City’s Administrative Code and by popular referendum for incorporation into the City Charter. The intention was to adopt a system of campaign finance reform to offset the advantages enjoyed by incumbents and provide opportunities to candidates who do not have ready access to big campaign contributors, as well as to provide means to coordinate public efforts to encourage voter registration and voting. In February 1988 the City Council passed Local Laws, 1988, No. 8 of the City of New York (enacting Administrative Code § 3-701 et seq.) which instituted a voluntary program of campaign finance reform for the offices of Mayor, Comptroller, Public Advocate, Borough President and Council Member. Local Law No. 8 establishes for voluntary participants specified caps on campaign contributions, sets specified spending limits and makes public funds available to participating candidates to match private contributions on a dollar-for-dollar basis up to a maximum of one half of the voluntary spending limit for the particular office. “Matchable contributions” are contributions of up to $1,000 per contributor made by natural persons who reside in New York City. Matching funds are only available if and when the campaign has collected a specified threshold amount as prescribed for the particular office. The voluntary participant must also collect matchable contributions from a specified minimum *17 number of contributors in satisfying the threshold requirement. The law contains a provision for acceleration of public financing when a participant faces a well-financed opponent who does not participate in the voluntary program.[2]
Chapter 46 of the Charter establishes the administrative arm of the City’s campaign finance reform program. Section 1051 in its entirety creates the Department of Campaign Finance. Section 1052 establishes the Campaign Finance Board whose obligation it is to administer “any voluntary system of campaign finance reform established by local law”. (Charter § 1052 [a] [5].) Section 1052 prescribes the qualifications, means of appointment of members of the Board and its powers and duties. Among the Board’s powers are the power to investigate all matters relating to the proper administration of any voluntary system of campaign finance reform established by local law (Charter § 1052 [a] [5]), to publicize the names of candidates who violate any of the provisions of any voluntary system of campaign finance reform established by local law (Charter § 1052 [a] [6]), to render advisory opinions with respect to questions arising under any local law establishing a voluntary system of campaign finance reform (Charter § 1052 [a] [7]), to promulgate such rules and provide such forms deemed necessary for the administration of any voluntary system of campaign finance reform established by local law, including regulations concerning the form in which contributions and expenditures are to be reported (Charter § 1052 [a] [8]), to develop a publicly accessible computer data base containing all information necessary for the proper administration of campaign finance (Charter § 1052 [a] [9]), and to take such other actions as are necessary and proper to carry out the purposes of any local law establishing a voluntary system of campaign finance reform (Charter § 1052 [a] [10]). Section 1052 (a) (10) further provides a mechanism to assure potential participants of the availability of matching funds. If the Board determines that the fund set aside for the program is insufficient for payment to participants, upon report thereof to the Commissioner of Finance an amount equal to the Board’s *18 estimate of the funds needed is required to be transferred from the general fund to such special fund. All monies transferred to the special fund “shall not be considered revenues of the city and payments from such fund or funds shall be made without appropriation and shall not be included in the expense budget of the city” (Charter § 1052 [a] [10]).
This chapter has been held to be “consistent with the general tenor of the Charter, which distinguishes between the broad lines of government appropriate to the Charter and the implementing legislation of local law, i.e., the Administrative Code” (Matter of Juntikka v Cuevas, supra, slip op, at 7; see, Matter of Van Ness v Cuevas, Sup Ct, NY County, Sept. 30, 1997, Saxe, J., index No. 116570/97, slip op, at 9-10, affd for reasons stated below 243 AD2d 283 [1st Dept], appeal dismissed and Iv denied 90 NY2d 963 [1997]; see also, Matter of Adams v Cuevas, 133 Misc 2d 63, supra; Matter of Astwood v Cohen, 291 NY 484, 488, supra; cf, minutes of public meeting of Charter Rev Commn, July 26, 1988, at 6 [verified answer, exhibit 7 to Shiono affirmation, dated Aug. 26, 1998] [Charter revisions are “not a place to preempt the role of the executive and legislative branches of government and it was probably optimally desirable to have a charter that expressed * * * in sufficient detail * * * the organization and structure of government but that in other respects it should express general intent and that it should be left to the administrative code of the city to deal with specific legislative matters”]).
Petitioners contend that the proposed local law is consistent with the general tenor of, relates to and amends existing provisions of the Charter; inasmuch as chapter 46 contains eight references to a voluntary system of campaign finance reform but does not mandate its creation, the proposed local law would amend that aspect by making the creation of such a system mandatory by defining a set of minimum standards therefor, namely that there be spending limits, contribution limits, and a ceiling on private contributions for qualified participants not to exceed 20% of the applicable spending limit, all to be determined by the City Council as to their particulars. Petitioners assert that the purpose and effect of these proposed amendments, taken as a package, make them part of the broad lines of government appropriate to the Charter as distinct from the implementing legislation of local law. Petitioners further assert that the proposed initiative is not insufficient for any failure to state its relation to or effect on existing law. They argue that it only generally requires the establishment of contribu *19 tion and. spending limits and fixes only one substantive term of the public funding scheme (that 80% or more of public funding be made available to qualified candidates). Petitioners assert that Municipal Home Rule Law § 37 requires only that new matter be underlined and deleted matter be bracketed, no more and no less, which their initiative petition does; if some manner of further explanation is necessary to make the practical effect of the initiative clear to the voters, the City Clerk may do so by his abstract under authority of Municipal Home Rule Law § 25. Petitioners contend the proposed changes directly relate to the program the Board is required to administer and fundamentally to the nature and quality of the democratic representation afforded by all elected offices established by the Charter.
While petitioners’ aims are laudible and their argument has some facial appeal, the fact is that while chapter 46 of the Charter gives the Board broad powers and authority in administering the City’s voluntary system of campaign finance reform, it does not include nor does it contemplate any substantive or defining provisions of such a program. The Charter specifically defers to the legislative process in that regard. Its eight references to a voluntary system of campaign finance reform are all carefully qualified to refer to a system as established by any local law. Nowhere does chapter 46 refer or even allude to levels of private contributions or of public funding for any such program.
The situation in this case is not unlike that of Matter of Juntikka v Cuevas (Sup Ct, NY County, Oct. 22, 1996, Shainswit, J., index No. 116778/96, supra). Here, petitioners seek to establish a limit on private contributions of not more than 20% of applicable voluntary spending limits, and a level of public funding of 80% or more of such voluntary spending limits. In Matter of Juntikka v Cuevas (supra) the petitioners sought to amend chapter 46 by establishing a limit of $100 on contributions and to increase the currently established matching grants to participating candidates under certain circumstances, as well as to establish a system of televised debates for certain candidates for City elective offices. Finding that there is no specific reference to campaign contribution limits or debate requirements in chapter 46 itself, the Juntikka court held that under the two-part test enunciated in Matter of Adams v Cuevas (supra) “the initiatives are not directly related to an existing provision of the Charter and * * * they impermissibly seek to expand the scope of the initiative and referendum proce *20 dure” (Matter of Juntikka v Cuevas, supra, slip op, at 9). The Appellate Division, First Department, held in affirming the lower court (232 AD2d 301, supra): “The * * * Clerk correctly rejected the initiative petitions inasmuch as the proposed amendments are not the proper subject of a referendum.”
Here, also, a plain reading of chapter 46 leads to the conclusion that petitioners’ initiative is not directly related to an existing provision of the Charter and is not the proper subject of a referendum. That the proposed initiative is characterized as one to make mandatory a voluntary system of campaign finance reform by defining certain aspects thereof does not correct the problem. Courts traditionally have looked beyond the format of proposed initiatives to determine if they may properly be considered Charter amendments. The initiative here admittedly and on its face sets specific levels of contributions and public funding, particulars relegated to the legislative process.
"The [Municipal Home Rule Law] delegates no power to the People to initiate or adopt by popular vote amendments to city ordinances, resolutions or local laws other than those amending a city charter. The statute excludes ordinances and resolutions from the definition of the term ‘local law’ ([Municipal Home Rule Law], § 2) * * *
“The test of validity in every case is whether the local law is in truth and in fact an amendment of a city charter” (Matter of Noonan v O’Leary, 206 Misc 175, 177, 178 [Sup Ct, Monroe County], affd 284 App Div 646 [4th Dept 1954]; see, Matter of Adams v Cuevas, supra, 133 Misc 2d, at 67).
As respondent contends, petitioners cannot bring the initiative under the restrictions of the Municipal Home Rule Law by artificially grafting an isolated parameter set forth in the Administrative Code onto unrelated provisions in the Charter. As set forth in Matter of Noonan v O’Leary (supra, 206 Misc, at 178): “[t]his is not a situation where the invalid portion can be stricken down and the valid portions, if any, of the proposed local law preserved because under section 19-a [predecessor to Municipal Home Rule Law § 37] the proposed local law as ‘set forth in full’ in the petition must be adopted or submitted to the electors ‘without change’ ”.
On the issue whether the initiative gives adequate notice to the voters of the effect that the adoption of the proposed local law would have on the City’s existing campaign finance program, set forth at Administrative Code § 3-701 et seq., respondent contends that the proposed initiative does not inform the voters that it changes the current scheme from a 50% pub- *21 lie funding program to an 80% or more public funding program, as well as changing the . cap on permitted contributions to be eligible for such funding (which in turn would require changes to the myriad other integrated provisions of the program). As set forth above, petitioners contend the Municipal Home Rule Law requires nothing more than that the text of the Charter amendments be identified by underlining new matter and bracketing deleted matter and that the proposal itself necessarily implies amendments must be made to the current program by the City Council. Respondent relies on court pronouncements, among others, in Matter of Lenihan v Blackwell (209 AD2d 1048 [4th Dept], Iv denied 84 NY2d 808 [1994]), which concerned a ballot proposition that would have amended the county charter by lowering from a two-thirds majority to a simple majority the vote required by the county legislature to increase sales and use taxes without informing the voters that the proposed amendment would alter the vote requirement; Matter of Sinawski v Cuevas (133 Misc 2d 72, affd 123 AD2d 548 [1st Dept], Iv denied 68 NY2d 609 [1986]), wherein the lower court held in respect of a ballot proposition that would have amended the City Charter to provide for the recall of elected officials and the election of their successors (found to be illegal by the Appellate Division and affirmed on that basis), inter alia, that the proposed local law must stand on its own and the validity of the poorly drafted ambiguous proposition could not be determined based upon how it may be amended or altered by the City Council; and Matter of Grenfell (Lawyer) (269 App Div 600 [3d Dept], affd 294 NY 610 [1945]), in which an initiative which proposed the adoption of a new form of government simply as that “defined and prescribed in the Second Class Cities Law”, was stricken on the ground that “[m]ere blanket references to the Second Class Cities Law are not sufficient. Voters are entitled to know from the language of the proposal itself precisely what they are called to pass upon, and should not be required by reference to examine the provisions of any statute” (269 App Div, at 603-604). However, in terms of the increased public funding contemplated by the proposed initiative in this case, it does inform the voters that its adoption will increase the moneys to be set aside for the voluntary system of campaign finance reform and contrary to respondent’s objection, on this score the proposed initiative does not reach the level of infirmity as in the cases cited above. While one might argue that it might also have been preferable to have included a sentence that adoption would require a *22 change in the current law concerning the cap on total contributions permitted to be raised in order to qualify for public funding, I do not find such omission to be fatal. To require the volume of specific and sometimes minute information respondent would impose upon such an initiative in respect of its effect on existing law would do violence to the very referendum process itself, making it a right in name only. One could hardly abide by all of the notice requirements respondent would impose in this particular case without running afoul of the distinctions between the Charter and legislative acts. The plain language of the proposal adequately informs the exceedingly aware electorate of this City of the import of the proposal.
Nevertheless, besides finding that the proposed initiative does not relate to or amend existing provisions in the Charter, I must also find that it fails to include an appropriate plan to provide moneys and revenues as required by Municipal Home Rule Law § 37 (11).
The proposal by its own terms requires additional revenues to meet proposed additional expenses. Petitioners rely on moneys from the general fund of the City government to cover the increase in moneys to be set aside for the voluntary system of campaign finance reform as proposed by the initiative petition. Reliance on general budgetary procedures to fund increased costs is insufficient to satisfy the requirements of Municipal Home Rule Law § 37 (11) (see, e.g., Matter of Adams v Cuevas, supra, 68 NY2d, at 192; Matter of Hardwick v Kramer, 200 Misc 207, affd 278 App Div 1040, affd 303 NY 605 [1951]). “To meet statutory requirements, a financing plan must identify available sources from which the needed new revenues can be obtained” (Matter of Adams v Cuevas, supra, 68 NY2d, at 192). Petitioners contend that the initiative’s proposed plan does not run afoul of the rule against funding increased costs from general budgetary procedures as its proposed financing plan identifies available sources from which the needed new revenues can be obtained, namely, the reduction of funds on a proportionate basis that would otherwise be available in the general fund for each of the offices of the Mayor, Comptroller, Public Advocate, Borough Presidents and City Council. Petitioners assert that funding a local law proposed by initiative through a redirection of appropriations that is both specific and adequate satisfies the requirements of the statute. In this regard petitioners have merely engaged in semantics. A “redirection of appropriations” may be said to be nothing but a manipulation of “general budgetary procedures”.
*23 More important, however, is that the Charter itself requires that payments from the special fund shall be made “without appropriation and shall not be included in the expense budget of the city” (Charter § 1052 [a] [10] [emphasis added]). By unilaterally reducing the City’s budgets to fund a voluntary system of campaign finance reform, payments from such fund necessarily become an expense of the City which is prohibited by chapter 46 of the Charter. Moreover, such a plan is inconsistent with and curtails the budgetary authority of the Mayor and the City Council under existing Charter provisions, which is not the function of the finance plan required by Municipal Home Rule Law § 37 (see, Matter of Juntikka v Cuevas, supra; Matter of Adams v Cuevas, supra).
Accordingly, petitioners’ application is denied and the petition is dismissed.

. The full text of the Charter amendment as proposed by the Initiative Petition For New York City Charter Amendment at issue is:
“a local law
“To amend the New York City Charter, in relation to a voluntary system of campaign finance reform.
“Be it enacted by the people of the City of New York pursuant to the authority provided in Section 37 of the Municipal Home Rule Law as follows: “Section 1. The New York City Charter is hereby amended by amending Section 1051 of Chapter 46 to read as follows:
“Section 1051. Voluntary System of Campaign Finance Reform “a. Department; board. There shall be a department of campaign finance. “b. In order to promote democracy and full participation in city elections and to reduce the influence of private wealth on the electoral process, there shall be a voluntary system of campaign finance reform in New York City to provide candidates who comply with contribution limits, spending limits and other qualifications established by local law, with public campaign financing.
“c. Definitions. As used in this chapter: (I) The term ‘a voluntary system of campaign finance reform’ shall mean a system that includes, for qualified candidates under paragraph b of this section who collect a set amount of private contributions and who raise no more than 20% of the applicable voluntary spending limits from private contributions, the provision of the balance of the voluntary spending limit from public funds, (ii) The term ‘candidate’ shall mean candidates for the offices of Mayor, Comptroller, Public Advocate, Borough President and City Council Member.
“d. The adoption of this charter amendment will increase the moneys to be set aside for the voluntary system of campaign finance reform under paragraph a. 10. of Section 1052 of this chapter. These funds shall be provided to the voluntary system of campaign finance reform by the Commissioner of Finance as required by paragraph a. 10 of Section 1052 of this chapter. To the extent necessary, these additional funds shall be raised by reducing the amount of funds on a proportionate basis that would otherwise be available in the general fund for each of the offices of the Mayoralty, Comptroller, Public Advocate, Borough Presidents and City Council.
“Section 2. This local law will take effect in the first fiscal year for which a New York city budget is prepared and adopted following enactment of this local law pursuant to Section 37 of the Municipal Home Rule Law.”

. In August 1998 a bill to amend the Campaign Finance Law was passed in the City Council. The amendments include provision, among others, for public funding to candidates who agree not to accept corporate contributions of $4 for every $1 raised up to a maximum of 55% of the spending limit for the particular office ($5 to $1 when facing nonparticipating opponents). The legislation would also lower contribution limits for participating candidates. At this writing there is no indication that the bill has yet been signed into law.